UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DANIEL LESHO,

                                             CASE NO: 04-CV-73150-DT

       Plaintiff,                          Judge:  Patrick J. Duggan

vs.

TEXTRON, INC.

       Defendant.

_____/

Neal J. Wilensky                          Lisa A. Robinson
Attorney for Plaintiff                 Attorney for Defendant
10775 S. Saginaw, Suite C          500 Woodward Avenue, Suite 2500
Grand Blanc, Michigan 48439       Detroit, Michigan 48226
(810) 606-0410                      (313) 961-0200

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**NOW COMES** Plaintiff, Daniel Lesho, by and through his attorneys, KAECHELE & WILENSKY, P.C., by Neal J. Wilensky and in response to Defendant Textron's Motion for Summary Judgment states as follows:

1.      This is a product liability case and the Statement of Facts outlines the facts and Plaintiff disagrees with the purported facts outlined in paragraph one of Defendant's Motion.

2.      Admitted.

3.      Denied in full as more fully set forth in Plaintiff's Brief in Response to this Motion.

4.      Admitted.

**WHEREFORE**, Plaintiff respectfully requests that this Court deny Defendant's Motion

pursuant to Fed R Civ P 56(c) and award costs for Defendant wrongfully bringing this Motion.

Respectfully submitted,

KAECHELE & WILENSKY, P.C.

S/Neal J. Wilensky
Neal J. Wilensky (P35182)
10775 S. Saginaw, Suite C
Grand Blanc, Michigan 48439
(810) 606-0410
cindycy02@hotmail.com

Dated: May 4, 2005

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL LESHO,

          Plaintiff,

vs.

TEXTRON, INC.

          Defendant.

CASE NO: 04-CV-73150-DT

Judge: Patrick J. Duggan

_____/

| | |
|---|---|
| Neal J. Wilensky | Lisa A. Robinson |
| Attorney for Plaintiff | Attorney for Defendant |
| 10775 S. Saginaw, Suite C | 900 Woodward Avenue, Suite 2500 |
| Grand Blanc, Michigan 48439 | Detroit, Michigan 48226 |
| (810) 606-0410 | (313) 961-0200 |

_____/

**PLAINTIFF'S BRIEF IN SUPPORT OF OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

--

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................. ii

STATEMENT OF ISSUES PRESENTED.......................................................... iii

MOST CONTROLLING AUTHORITIES........................................................... v

STATEMENT OF FACTS.................................................................................. 1

ARGUMENT...................................................................................................... 10

    Federal Standards......................................................................................... 10

    Alteration or Misuse..................................................................................... 12

    Alleged Misuse of Cart................................................................................ 14

    Duty Element of Defective Design Claim.................................................... 15

    Causation...................................................................................................... 18

    Product Identity............................................................................................ 19

CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES:**

Bazinau vs. Mackinaw Island Carriage Tours, 233 Mich App 743 (1999).......... iii, v, 17, 18

Cacevic vs. Simplimatic Engineering Co.,
    (on remand), 248 Mich App 670 (2001)................................... v, 16, 17

Chaney vs. Whiting Corporation, 100 Mich App 198 (1990)............................ iii, v, 16, 17, 18, 19

Donajoski vs. Alpena Power Company, 219 Mich App 411 (1996)................... iii

Farm Bureau Mutual Insurance Company vs. Stark,
    437 Mich 175 (1991)..................................................... iii

Graham vs. Ryerson, 96 Mich App 480 (1980)................................................. 15

Huff vs. Ford Motor Company, 127 Mich App 287 (1983).............................. v, 16

Matsushita Electric Industrial Corporation vs. Zenith Radio Corporation,
    475 US 574 (1986).................................................... iii

Quinto vs. Cross & Peters Co., 451 Mich 358 (1998)....................................... iii

Radtke vs. Everett, 422 Mich 368 (1993)......................................................... iii, v

**STATUTES:**

MCLA 600.29464......................................................................... v, 10

MCLA 600.2947........................................................................... 12, 14

MCLA 600.29462......................................................................... 15

**RULES:**

Fed R Civ P 56(c)........................................................................ 2

## STATEMENT OF ISSUES PRESENTED

Defendant seeks summary disposition based on five arguments as set forth in their brief. Plaintiff has responded in opposition to each argument citing testimony produced at depositions, Exhibits, Plaintiff's expert report, and other materials to oppose this motion. All depositions, affidavits, admissions, and any other documentary evidence similarly are to be considered in the light most favorable to Plaintiffs. Radtke vs. Everett, 442 Mich 368 (1993), Matsushita Electric Industrial Corporation vs. Zenith Radio Corporation, 475 US 574 (1986). All reasonable inferences from the evidence must also be considered in favor of Plaintiffs. Radtke, supra. The Court must accept as true all of Plaintiff's well pled factual allegations and construe them in a light most favorable to Plaintiff. Quinto vs. Cross & Peters Co., 451 Mich 358 (1998). The Court must be satisfied that it is impossible for Plaintiff's claims to be supported at trial because of deficiencies which can not be overcome. Farm Bureau Mutual Insurance Company vs. Stark, 437 Mich 175 (1991). In Donajoski vs. Alpena Power Company, 219 Mich App 441 (1996) the Court held that a trial Court may not weigh evidence before it makes findings of fact. If evidence before it is conflicting summary judgment is improper. Whether a product was unreasonably designed is a question for the jury. Chaney vs. Whiting Corporation, 100 Mich App 198 (1980).

The main question presented to this Court is Plaintiff has claimed damages against Defendant because the vehicle as designed, produced, and distributed did not have an operator seat safety switch. With the power being left in an on position a ladder struck the accelerator pedal causing the vehicle to move forward and strike the Plaintiff causing serious injury. The elements to this case are: has the manufacturer eliminated any unreasonable risk of foreseeable injury? Bazinau vs. Mackinaw Island Carriage Tours, 233 Mich App 743 (1999); and whether the

-iii-

Defendant used reasonable care in designing and distributing the industrial cart at the time it designed or manufactured the industrial cart pursuant to SJI 2d 25.31.  There are other issues contained in Defendant's motion relating to the overall issues as stated above which are fully addressed in Plaintiff's response brief.

## MOST CONTROLLING AUTHORITIES

MCLA 600.29464

Huff vs. Ford Motor Company, 127 Mich App 287 (1983)

Chaney vs. Whiting Corporation, 100 Mich App 198 (1980)

Bazinau vs. Mackinaw Island Carriage Tours, 233 Mich App 743 (1999)

Cacevic vs. Simplimatic Engineering Co., (on remand), 248 Mich App 670 (2001)

SJI 2d 25.31

Radtke vs. Everett, 442 Mich 368 (1993)

## STATEMENT OF FACTS

Plaintiff, Daniel Lesho was a skilled tradesman (electrician) employed by General Motors at the Pontiac East assembly plant.  He suffered a serious injury in the early morning of August 11, 2001 while in the course of his employment.  Plaintiff Lesho and a co-employee, fellow electrician Mark Bowen, went from their work station to another part of the plant to repair a burnt out light just outside the building of the Pontiac East assembly plant.  The light was higher than ground level and a ladder was needed to access the light.  The method of transportation for Plaintiff, Lesho and his co-worker, Mark Bowen was an electrical powered industrial cart manufactured and distributed by Defendant Textron.  A picture of the cart following the accident is attached as **Plaintiff's Exhibit #1**.  A picture of the serial number on the cart is attached as **Plaintiff's Exhibit #2**.  A description of the incident report produced by way of subpoena by Plaintiff's employer, General Motors, entitled Safety Incident Report, GM000851 is attached as **Plaintiff's Exhibit #3**.

Mark Bowen procured a six foot step ladder near the work station and took the ladder with him and Mr. Lesho to go inspect and repair the light.  At all times relating to this accident Mark Bowen operated the electrical cart.  Mark Bowen's testimony is as follows:

Q.    "What happened next?

A.    Well, we parked the cart that we had driven over on.  We had taken a ladder from our workshop right there in the area where we work.  And when we arrived, we parked right in front of the door, just --- there was no traffic.  There's no production.  It's a very, very quiet time of the night --- and went through the doorway.  And I set the ladder up and climbed up to take a look at the light fixture and saw that it was pretty much damaged beyond repair.  The ballast burned up, and we were going to have to order parts for an entirely new light fixture.  So at that time, we came back into the building.  We're just going to return to the shop, and that's when the accident happened.

-1-

Q.      Explain to me how the accident happened.

A.      Well, now, as near as I can recall, Dan had just basically helped me as far as holding the door when I carried the ladder out. I guess, if you want to say it was my job as the volunteer to this favor, that I wasn't going to make him do all the work. So he just aided me. He opened the door; and when I came back in, he had opened the door again. And as I came into the building, he followed me in from holding the door.

Q.      So you went in first.

A.      Yes. And when I put the ladder on the cart --- I don't know how I would describe it as far as --- you would just shut the thing down and then pivot into position, that the ladder --- the feet of the ladder hit on the accelerator and just took off.

        And at that point, he was just coming in the building, so he was in front of the cart. And there was the guard posts, so that a pedestrian coming in from outside, somebody wouldn't hit you. And he was pinched in between the cart and the guard post."
        **Plaintiff's Exhibit #4** (Bowen deposition, pgs. 12, 13, 14)

Bowen testified that the ladder was obtained near their work station and they had the ladder with them when Bowen stopped the electric industrial cart at the point Lesho and Bowen were going to make their inspection. Bowen prepared a diagram as an attachment to his deposition and this is attached as **Plaintiff's Exhibit #5**. The vehicle was stopped near an outdoor entrance at the south part of the plant in the A isle.

Bowen was asked again how the accident happened, the Defendant trying to infer that Bowen did not see the accident.

Q.      "Did you actually see the vehicle hit Mr. Lesho?

A.      I can't say that I saw it hit him; but, I mean, I was right there. And he was --- the ladder was still on the accelerator accelerating, holding him pinched against this post."
        **Plaintiff's Exhibit #4** (Bowen deposition, pg. 17)

Bowen provided additional testimony as to how the accident happened as follows:

-2-

Q.      "Did you put it in feet first, or did you put in the top of the ladder first?

A.      Feet first.

Q.      And then what happened?

A.      Well, as I pivoted the top into the center position of the seat, that's when the ladder hit the accelerator. And, of course, when I looked up, there he stood with the cart having him pinned against the cart and the post."
**Plaintiff's Exhibit #4** (Bowen deposition, pgs. 27, 28)

Plaintiff, Daniel Lesho was taken to St. Joseph Hospital in Pontiac and treated for, among other injuries, a fractured right femur.  Lesho's injuries, suffice it to say, were very serious, the healing process went poorly and Daniel Lesho, three and a half years later, remains off work, in significant pain, never able to work at his trade again.

After the incident and the safety incident report was prepared, General Motors hired Great Lakes Power Service in the person of a Terry Dobbyn to inspect the vehicle.  The Great Lakes Power Lift work order is attached as **Plaintiff's Exhibit #6**. The vehicle was inspected by Terry Dobbyn  within approximately two weeks from the accident and a copy, although it is not highly legible, is attached as **Plaintiff's Exhibit #7**.  The serial number 1244060 of the vehicle matches the serial number on the picture of the vehicle that was taken in a plant inspection wherein General Motors pointed out which vehicle was involved in the accident.

Dobbyn testified that his inspection revealed that the cart was in good mechanical order. The only thing that it missed was a seat switch so that when an operator got off the seat the vehicle would not travel in either direction if something was actually dropped on the accelerator pedal.

Q.      "Is there anything that you noted which was defective with regard to the function of the cart?

-3-

A.    The only thing I did note on the work order was that on some EZ-Gos they had a seat switch; that when the operator got off the seat, the vehicle would not travel in either direction if something was actually dropped on the accelerator pedal."
**Plaintiff's Exhibit #8** (Dobbyn deposition, pgs. 13, 14)

The deposition of Michael Fagan was taken March 2, 2005.  Fagan heads a company known as Chief Cart.  Chief Cart is an authorized representative for EZ-Go which is a brand of Defendant's products.

Q.    "Can you tell me, what is Chief Cart?

A.    We are an authorized EZ-Go dealer, dealing with sales, service, parts, rental and logistics."
**Plaintiff's Exhibit #9** (Fagan deposition, pg. 4)

Fagan testified that General Motors ordered a total of eighteen vehicles from Chief Cart, twelve EZ-Go 800E and six EZ-Go 800E that had a flip rear seat.  Unit 1244060 did not have a flip rear seat. (**Plaintiff's Exhibit #9**, Fagan deposition, pgs. 16, 17).

The General Motors Purchase Order is attached as **Plaintiff's Exhibit #10**.

**Plaintiff's Exhibit #11** is a Chief Cart document documenting the purchase by General Motors at the Pontiac East facility.  The delivery date called for was September 23, 1999 and it included the serial number 1244060, the vehicle involved in the accident with Daniel Lesho. (**Plaintiff's Exhibit #9**, Fagan deposition, pg. 28).

Fagan did testify that General Motors had requested to have a substance called multi seal to keep the tires from going flat and it asked for toggle switches to be installed on each of the vehicles in lieu of an ignition switch.

Q.    "Can you explain to me what the toggle switch is for?

A.    Basically, the toggle switch ---, the ignition, which takes a key, a generic key albeit --- but they had specifically asked for that ignition to be removed and two toggle

-4-

switches to be put in lieu of that, to turn the vehicle on and off."
**Plaintiff's Exhibit #9** (Fagan deposition, pg. 32)

Fagan's testimony conformed with the testimony of James Fisher that the 800E industrial

cart does not come with either a standard or option feature of a seat safety switch.

Q.   "To your knowledge, does the 800E come standard with such a switch?

A.   No."
**Plaintiff's Exhibit #9** (Fagan deposition, pg. 38)

Significantly Chief Cart did not place the order with General Motors until after Fagan had

the discussions with GM purchasing agent Tom Fuller about the toggle switch option. (**Plaintiff's**

**Exhibit #9**, Fagan deposition, pg. 39).

Fagan testified that after he received the eighteen cart order he talked to EZ-Go about the

purchase.

Q.   "Do you know who you would have talked to?

A.   At the time there was a, what is called a local branch that covered the State of
Michigan, that was actually located very close to the airport, just a few miles from
here, that has since closed down.  They had a --- it would have been an operations
person, they would have had a general manager, then she would have had a staff of
people.  Our communication more than likely would have been with a gentleman
by the name of Don Hicks, who was employed as the operations person there to
negotiate pricing for this particular deal.

Q.   So for this particular deal then, did you talk to Mr. Hicks, say I have got a request
for purchase for Pontiac East and we've got the potential to sell them 18 carts?

A.   Yes."
**Plaintiff's Exhibit #9** (Fagan deposition, pgs. 48, 49)

Plaintiff also deposed James Fisher a past design engineer with Textron whose current job

status was that of manager, product reliability.  Fisher testified that EZ-Go is principally a golf

cart manufacturing company that also produces a line of utility trucks, industrial vehicles, and

personnel carriers that are sold into several different markets.  (**Plaintiff's Exhibit #12**, Fisher

deposition, pg. 7).  In along these lines of industrial vehicles Fisher testified that Textron (EZ-Go)

makes single passenger, sit down and stand up parts pickers, platform carriers, and utility trucks.

Fisher testified that the vehicle in question, serial number 1244060, was part of the EZ-Go

industrial 800 series and was considered an industrial vehicle.

> Q.    "Let me make sure I get the model right here.  You're familiar with the vehicle
>        that's the subject matter of this litigation?
>
> A.     Yes.
>
> Q.     And it was part of the EZ-Go industrial 800 series?
>
> A.     Correct."
>        **Plaintiff's Exhibit #12** (Fisher deposition, pg. 8)

Fisher testified that the top speed of this vehicle, serial number 1244060, was twelve miles

per hour and could not be modified. (**Plaintiff's Exhibit #12**, Fisher deposition, pg. 10).

Fisher testified that serial number 1244060, the industrial cart, was manufactured at their

facility in Augusta, Georgia in 1999.  He also testified that EZ-Go sold four hundred similar carts

in 1999 and approximately four hundred in 2000.  Interestingly, Defendant's representative,

Fisher testified as follows regarding OSHA standards:

> Q.    "Are you aware of any OSHA standards that have to do with this type of utility
>        cart that you have to comply with?
>
> A.     There is an OSHA standard for burden carriers.  I don't know the exact title of it.
>
> Q.     What does the standard relate to?
>
> A.     What do you mean relate to?
>
> Q.     Does 1910.178 have any specific requirements as to type of safety devices on
>        industrial carts?

A.    Not safety devices, that I recall.  There's verbiage in it about, you know, what charging station.  If it's an electric vehicle, you know, you're not supposed to smoke in the charging station.  It has to be a dedicated charging system.  It's that kind of verbiage."
**Plaintiff's Exhibit #12** (Fisher deposition, pgs. 20, 21)

Fisher corroborated other witnesses saying that this vehicle, the cart model number

1244060, was manufactured and distributed without a operator seat switch inside the seat.

Q.    "By the way, in the original interrogatory No. 4, the response was that the cart, model No. 1244060, was manufactured and distributed without a seat safety switch or without a safety switch inside the seat; is that true?

A.    It was distributed without a switch inside the seat, yes."
**Plaintiff's Exhibit #12** (Fisher deposition, pg. 23)

Fisher did testify that he was familiar with the term seat safety switches and that they were

offered on some of the other lines of EZ-Go industrial vehicles.

Q.    "What type of vehicle?

A.    The heavy duty, the platform carriers that I refer to, have that as a standard feature."
**Plaintiff's Exhibit #12** (Fisher deposition, pg. 24)

Later, Fisher testified that the stock chaser type of vehicle did have a seat safety switch.

Q.    "You believe that has the seat safety switch, but you're not sure.

A.    Correct.  I do believe it does."
**Plaintiff's Exhibit #12** (Fisher deposition, pg. 26)

Fisher admitted that the technology involving manufacturing a device with a seat safety

switch was simple.

Q.    "Can you explain what the technology is to installing that seat safety switch.

A.    I mean, the technology is to open the circuit, the power circuit to the vehicle, by sensing an operator on the seat.

-7-

Q.   So there's some additional wiring that has to be done?

A.   Correct."
**Plaintiff's Exhibit #12** (Fisher deposition, pg. 26)

Fisher testified that <u>the decision whether a type of industrial vehicle has a seat safety</u>

<u>switch or not was mandated by customer request, not safety concerns</u>.

Q.   "Who makes the decision on whether the particular vehicle, like the platform
carrier, would have a seat safety switch as opposed to not having a seat safety
switch, or the industrial cart having a seat safety switch or not?

A.   In this case, it would be the customer that would make that decision.  It's not a
mandated, by standard feature.  It's not something we have to put on it.
Therefore, if the customer requests it, EZ-Go, like most companies would do what
they could to try to get it."
**Plaintiff's Exhibit #12** (Fisher deposition, pg. 30)

Fisher admitted that Textron never warned General Motors or Chief Cart not to have the

user operate this model without a safety switch inside the seat.  **Plaintiff's Exhibit #13** is

Defendant's Answer to Supplemental Interrogatory number 2 dated March 10, 2005. (**Plaintiff's**

**Exhibit #12**, Fisher Deposition, pg. 36.

Fisher admitted that the wires and the mechanism of an electrical seat switch would be the

same in an industrial cart as it is in the other line of industrial vehicles.

Q.   "So would it be the same type of concept if you had this is a hypothetical --- if you
had an operator switch for an industrial cart, would it be the same type of wires
from the electrical source to the inside of the seat and then a switch?

A.   I mean, again, I'm not in the design side now.  But it would be ostensively the
same type of system.

Q.   It's the same type of system for, assuming that you're right, the sit-down stock
chasers have them.  It would be the same type of system.

A.   Correct.

-8-

Q.    And EZ-Go has that knowledge, because you're already doing it on the platform vehicles, correct?

A.    Correct."
       **Plaintiff's Exhibit #12** (Fisher deposition, pgs. 38, 39)

Then, tellingly, Fisher was asked why EZ-Go (Textron) had the operator seat switch in some types of industrial vehicles and not on others.

Q.    "Can you tell me, again --- we're going back to that '99 time frame, so prior to your acquisition of the Cushman line --- the rationale for not having an operator switch on the industrial carts, either as a standard feature of a factory option, but having at least this type of switch, the operator switch as a factory option for your platform carrier or your sit-down stock chaser?

A.    The platform carriers and the sit-down stock chasers are typically used inside a factory, so they're typically use inside a factor, so they're typically operated on level or ramp only grades.  But they're run around inside, primarily.  Some customers want that feature and others don't. ------

Q.    But I asked you in the beginning, it's foreseeable that an industrial cart would be used on a factory floor.

A.    Absolutely.  It's foreseeable that industrial carts could be used in factory settings, yes."
       **Plaintiff's Exhibit #12** (Fisher deposition, pgs. 40, 41)

General Motors had the operator seat switches installed after the Lesho accident.  Fisher admitted that it was not any more difficult or less difficult to install these operator seat switches either at the factory or later on. (**Plaintiff's Exhibit #12**, Fisher deposition, pg. 43).

Lastly, Fisher admitted that the owners manual and service guide produced as part of this litigation specifically had a page on the parking brake, Bates No. 00017 (**Plaintiff's Exhibit #14**). The note states that depressing the accelerator will release the parking brake if it is engaged. Fisher admitted that this was the way the vehicle operated.

Q.    "If you depress the accelerator, that releases the parking brake?

-9-

A.      Correct.  It will release the parking brake."
        **Plaintiff's Exhibit #12** (Fisher deposition, pg. 49)

## ARGUMENT

## FEDERAL STANDARDS

MCLA 600.29464 states that it is a rebutable presumption that the manufacturer or seller is not liable if at the time the specific unit of the product was sold or delivered it was in compliance with standards relative to the event causing the injury as set forth in Federal or State Statute or was in compliance with regulations or standards relevant to the event causing the injury promulgated by a Federal or State agency responsible for reviewing the safety of the product.

Defendant tries to use this Statute to ask this Court to take the ultimate measure and dismiss Plaintiff's law suit when the clear language in the Statute provides that compliance, if proven, is only a rebutable presumption against liability.  This Court well knows that a rebutable presumption and Motion for Summary Disposition are not one in the same thing.

Thus, a review of the statutory language indicates that, at most, compliance with a Federal or State Statue or a regulation or standard promulgated by a Federal or State agency creates a rebutable presumption of non liability and if the standard is only an industry standard not adopted by Federal or State statute or a Federal or State regulatory agency then it is simply admissible evidence in the cause of action.

Plaintiff cites this Court to Defendant's conduct regarding Federal and State regulatory actions.  Plaintiff's Interrogatory #8, **Plaintiff's Exhibit #15**, stated:

8.      At the time the Textron EZ-Go cart, serial number 1244060 was manufactured and
        distributed was there any industrial standards or governmental standards regarding
        the type, location, or number of safety switches that regulated a manufacturer or
        distribution, or sale of this particular type of EZ-Go industrial cart.  If so, please

-10-

state the governing body, the type of regulation and when the regulation
promulgated.

RESPONSE:   Defendant objects to this interrogatory as overly broad, ambiguous, and
susceptible to multiple meanings.  Without waiving this objection,
Defendant answers no.

Defendant has not formally designated an expert in this matter.  Orally, which will be

subject to challenge, they have designated James Fisher a product design employee of Defendant.

Fisher was deposed eight days before the close of discovery.  Fisher stated, in relevant part,:

Q.      "Are you aware of any OSHA standards that have to do with this type of utility
cart that you have to comply with?

A.      There is an OSHA standard for burden carriers.  I don't know the exact title of it."
**Plaintiff's Exhibit #12** (Fisher deposition, pg. 20)

Defendant clearly did not know how the OSHA regulation of 1910.178 applied or did not

apply.  Defendant's Answers to Interrogatories should be given weight by this Court or they were

responded to in a disingenuous manner.  The OSHA standard in question, Title 29, Volume 5,

Part 1910.178 states:

"All new powered industrial trucks required and used by an employer after the effective
date specific in paragraph (b) of Section 1910.182 shall meet the design and construction
requirements for powered industrial vehicles established in the American National
Standard for Powered Industrial Trucks Part II, ANSI B56.1-1969 which is incorporated
by reference as specified in Section 1910.6 except for vehicles intended primarily for earth
moving or over the road hauling."
**(Plaintiff's Exhibit #16)**

Section 1910.6 of Title 29, Volume 5 of the Occupational Safety and Health Act states:

"The standards of agencies of the U.S. Government and organizations which are not
agencies of the U.S. Government which are incorporated by reference in this part, have
the same force and effect as other standards in this part.  Only mandatory provisions (i.e.
provisions containing the word "shall" or other mandatory language) of standards

-11-

incorporated by references are adopted as standards under the Occupational Safety and
Health Act."
**(Plaintiff's Exhibit #17)**

    **Plaintiff's Exhibit #18** is an e-mail dated April 21, 2005  from Mr. Mohamed who is an

ANSI employee in the division relating to the ANSI standards that have been quoted above

indicating that 56.1-1969 regarding powered industrial trucks covered all vehicles of the current

B56 series and that the 56.8 ANSI standard developed in 1993 is being revised currently and is

pending publication.   The Defendant has cited ANSI standard B56.8 for personnel and burden

carriers.  However, this standard promulgated by ANSI was not incorporated into the OSHA

standard.  Defendant well knows that.

    Plaintiff will submit evidence that Defendant's powered industrial cart Serial No. 1244060,

which is the subject matter of this litigation, was not in compliance with Standard B56.1969 and

the previous ANSI standard promulgated in 1959 and subsequent ANSI standards including the

1975 standard, **Plaintiff's Exhibit #19**.  Clearly this section is replete with factual issues which

form the basis of this Court denying Defendant's motion as to compliance with State or Federal

Statutes or regulatory standards.  Besides, Defendant's informally designated expert does not

know how the OSHA regulation applies.

## ALTERATION OR MISUSE

    The proper statutory section which was not quoted properly by Defendant is MCLA

600.2947.  It says that a manufacturer or seller is not  liable in a product liability action for harm

caused by an alteration of the product unless the alteration was reasonably foreseeable.  Whether

there was an alteration of the product and whether an alteration was reasonably foreseeable are

legal issues to be resolved by the Court.  Defendant brings this argument because the key switch

was replaced by a toggle switch.  However, this was performed with Defendant's knowledge and by an agent of the Defendant, not by General Motors or the Plaintiff.  Furthermore, the alteration has to have something to do with the accident.

Plaintiff's expert, Professor Koenig, has stated that the toggle switch is a safety switch that replaced the key switch.  It is replacing one safety switch for the other.  The warnings on the front plate of the vehicle that Defendant has cited this Court to remained in place.  Mark Bowen testified that he did not recall reading a plate that when you leave a vehicle you have got to turn the power off. (**Plaintiff's Exhibit #4**, Bowen deposition, pg. 57).  Bowen did not recall reading the front dash board plate warnings. (**Plaintiff's Exhibit #4**, Bowen deposition, pg. 56).

Specifically Professor Koenig opined that the toggle switch was not a defective replacement for the key switch. (**Plaintiff's Exhibit #20**, Koenig deposition, pg. 134).  Furthermore Plaintiff asserts that <u>Chief Cart, which made the switch to the toggle switch was an agent of Defendant and had informed Defendant.</u>

Michael Fagan testified that Chief Cart was an authorized EZ-Go dealer dealing with sales, service, parts, rental and logistics. (**Plaintiff's Exhibit #9**, Fagan deposition, pg. 4).  Fagan testified that a toggle switch operated the same as a key switch. (**Plaintiff's Exhibit #9**, Fagan deposition, pg. 33).

**Plaintiff's Exhibit #21** specifically shows the invoice to Chief Cart for the vehicles including 1244060, the toggle switches.  Plaintiff asserts that this invoice was forwarded to Defendant so that they did have knowledge of the addition of the toggle switch in place of the key switch.

Mark Bowen operated the way ninety-five percent or more of golfers do when they are

-13-

riding a cart which is also made by Defendant.  They bring the vehicle to a stop but they do not turn the key off or toggle switch off when they go to hit their shot.

A toggle switch was not related to the cause of the accident and the so called alteration certainly was reasonably foreseeable.

## ALLEGED MISUSE OF CART

At all times relevant hereto the cart was used as intended to take Mr. Bowen and Mr. Lesho to a place in the factory where they were going to perform inspection and repairs as electricians.  The vehicle was stopped but was not in the off position at the time of the accident. MCLA 600.2947(2) says that a product manufacturer or seller is not liable when misuse of the product is the cause of the accident unless the misuse was reasonably foreseeable.  Plaintiff states that there was no misuse of the vehicle in this instance.

The alleged misuse and the lack of the seat safety switch go to the very nature of this claim.  There are any numbers of golfers that do not turn a key off when they bring their golf cart to a stop to take a shot or hit a shot.  Bowen testified that even when the vehicles are parked and charged by electric shock they are left with the power on. (**Plaintiff's Exhibit #4**, Bowen deposition, pg. 63).

Terry Dobbyn, the person General Motors hired at Great Lakes Power Service to inspect the vehicle following the accident, testified that he paid no attention to the plate warnings on the dash board of the cart.

Q.    "When you inspected the vehicle did you see this particular plate on the dashboard of the cart?

A.    Again, it may have been there, but I didn't read it.  Most safety warnings are just like everybody else, I blow by them."

-14-

(**Plaintiff's Exhibit #8**, Dobbyn deposition, pg. 28)

Dobbyn testified that if this vehicle had an operator safety seat switch it would not have moved forward given what happened at the time of the accident. (**Plaintiff's Exhibit #8**, Dobbyn deposition, pg. 25). Dobbyn further testified that most of the electric carts that he had worked on in the past had operator seat switches or deadman switches. (**Plaintiff's Exhibit #8**, Dobbyn deposition, pg. 25).

Clearly if there was misuse which Plaintiff denies, it was clearly foreseeable.

Defendant also criticized General Motors for lack of training, but specifically this lack of training is certainly foreseeable. Professor Koenig in his report, **Plaintiff's Exhibit #22**, specifically stated that it was foreseeable that design tools three and four would not eliminate the hazzard of unintentional movement due to accidental activation of the control pedal. Manufacturers are duty bound to design products that are safe for their intended or reasonably anticipated use which may include reasonably anticipated misuse. <u>Graham</u> vs. <u>Ryerson</u>, 96 Mich App 480 (1980).

In fact, as stated by Professor Koenig, **Plaintiff's Exhibit #22**, Textron is inconsistent in their safety approach of their product line of industrial vehicles in that some models of vehicles produced in this time period were equipped with a seat safety switch as standard equipment and other models as an optional accessory.

## DUTY ELEMENT OF DEFECTIVE DESIGN CLAIM

MCLA 600.29462 sets forth that a manufacturer or seller is not liable unless the Plaintiff establishes that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller and that according to the generally accepted production

-15-

practices at the time the specific unit left the control of the manufacturer or seller a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product.  Defendant then quotes Cacevic vs. Simplimatic Engineering Co., (on remand), 248 Mich App 670 (201). A product may be unreasonably dangerous if the manufacturer omits a safety devise. Huff vs. Ford Motor Company, 127 Mich App 287 (1983).  The question of whether a product was unreasonably designed is a question for the jury.  Chaney vs. Whiting Corporation, 100 Mich App 198 (1980).

Plaintiff relies on his expert's opinion, **Plaintiff's Exhibit #22**.  Professor Koenig has provided a very detailed report specific to why the product, the industrial cart, was unsafe without the drive seat safety switch and that Plaintiff would not have been injured had this vehicle had the operator seat safety switch.

Defendant's inhouse design person, James Fisher, testified that it is absolutely foreseeable that industrial carts would be used in factory settings.  (**Plaintiff's Exhibit #12**, Fisher deposition, pgs. 40, 41).  Defendant had the knowledge of installing an operator seat switch because it installed it on two of their other industrial type vehicles.  (**Plaintiff's Exhibit #12**, Fisher deposition, pgs. 38, 39).

Fisher's testimony, **Plaintiff's Exhibit #12**, at page 38 clearly demonstrates that Defendant knew the purpose of an operator seat safety switch.

Fisher testified that he did not know the cost, but it would involve putting a few wires and a harness to install an operator seat safety switch on an industrial cart.  Clearly, Defendant knew that there was a technically feasible alternative that was available that would have prevented the

-16-

harm without impairing utility of the vehicle.  In fact in Interrogatory Answers received on April

29, 2005 Defendant admitted the retail cost was $88.00 in 2003. **Plaintiff's Exhibit #7**, Dobbyns

Inspection states that there needs to be a seat safety switch installed in the seat to prevent any

travel if the operator fails to get off the unit and shuts it off.  (**Plaintiff's Exhibit #8**, Dobbyn

deposition, pg. 15). The  Cacevic vs. Simplimatic Engineering Co., (on remand), 248 Mich App

670 (201) case analyzed the SJI 2d 25.31 Jury Instruction. Plaintiff asserts that the questions that

are raised in SJI 2d 25.31 are just that, they are questions that need to be answered by the jury in

rendering a verdict at the close of proofs in a trial. A manufacturer has a duty to eliminate any

reasonable risk of foreseeable injury. Bazinau vs. Mackinaw Island Carriage Tours, 233 Mich App

743 (1999) and Cacevic vs. Simplimatic Engineering Co., (on remand), 248 Mich App 670

(2001).  Cacevic vs. Simplimatic, supra goes on to say that in a design defect case there must be

a showing of the magnitude of foreseeable risk including the likelihood of occurrence of this type

of accident precipitating the need for the safety device.  In Cacevic, supra, the Court relied on

Defendant's expert which stated that the mesh guard was totally inadequate, the device violated

ANSI standards, and the Defendant did not use reasonable and diligent care to eliminate a

reasonably foreseeable risk of harm.    The Cacevic, supra Court was satisfied that this testimony

met the standard of showing the magnitude of foreseeable risks.  Professor Koenig's report, his

reliance on materials cited in his report, the ANSI standards back to 1959 and Defendant's

knowledge of the foreseeable risk of harm by the presence of their operator seat safety switches in

two types of industrial vehicles clearly satisfies the type of foreseeable risk involved in this case.

     Thus, whether Defendant has met its duty or breached its duty to eliminate any

unreasonable risk of foreseeable injury is a jury question. Chaney vs. Whiting, supra, Bazinau vs.

-17-

Mackinaw Island Carriage Tours, supra.

## CAUSATION

In his report Professor Koenig clearly states that it was highly probable that Plaintiff would not have been injured had the vehicle in question, designed and manufactured by Defendant Textron, had an operator seat safety switch. **Plaintiff's Exhibit #22**. Koenig reaffirmed this opinion at the close of his deposition on page 186, **Plaintiff's Exhibit #20**. Not only that, but the fact witnesses, Terry Dobbyn and Mark Bowen, both stated that this accident would not have happened had the cart had an operator safety seat switch. In their brief Defendant claims that Plaintiff has slight evidence of causation which of course is Defendant's categorization of the clear evidence presented to date.

Plaintiff clearly will present proofs at trial both in lay testimony of Mark Bowen, Terry Dobbyn and the testimony of its expert, Professor Milton Koenig that the injury would not have occurred but for the presence of the seat safety switch.

The toggle switch issue and the operator not turning off the power are not superseding or intervening causes as Defendant submits. Chaney vs. Whiting, supra. In fact, the whole purpose of having the seat safety switch is to have a back up measure of having the vehicle not move forward if the power is left on and the accelerator pedal accidently depressed.

Professor Koenig in his expert opinion went into great detail as to why the National Safety Council published a list of effective tools to achieve safety in the design of a product. In fact, according to the National Safety Council and the standard published in 1944 No. 5, it is recognized that there will be methods of abuse and that steps have to be taken to eliminate or minimize the consequences associated with the actions. These standards were published as far

back as 1944.  Koenig particularly stated that the operator seat safety switch would have had a high probability of preventing the unintentional movement of the vehicle under the conditions present at Lesho's accident.  He further opined that there were a multitude of sequences which could occur in an industrial setting which would cause accidental activation of the control pedal.

As to intervening cause, in the case of <u>Chaney</u> vs. <u>Whiting</u>, supra where a General Motors foreman did not sound an alarm prior to dropping molten iron from the cupola the Court held that this was not an independent intervening cause of Plaintiff's injuries and that it was foreseeable that a foreman might forget to sound an alarm.  <u>Chaney vs. Whiting</u>, 100 Mich App 108 (1980). In fact, the Court goes on to state that not only is it foreseeable that a foreman might forget to sound an alarm but that is precisely why an automatic interlock between the alarm and cupola door should have been included in the design.

Defendant does not address the issue that Professor Koenig's opinion established causation and that he had not changed his opinion by virtue of cross-examination by the Defendant. (**Plaintiff's Exhibit 21**, Koenig deposition, pg. 186).   Clearly Plaintiff had provided the requisite proofs regarding the issue of causation for this case to proceed to a jury.

## PRODUCT IDENTITY

Defendant raises this issue as paragraph A in the motion itself .  However, <u>the issue of product identity is not briefed by Defendant whatsoever</u> or any arguments propounded by Defendant as to product identity.  Plaintiff  moves this Court that it should not allow Defendant to raise arguments in rebuttal that it did not raise in their motion.

Plaintiff has amassed substantial evidence as to product identity.  They include the work order prepared by Terry Dobbyn, **Plaintiff's Exhibit #6**, the serial number matches the picture of

-19-

the vehicle taken at the plant on the inspection that was hosted by General Motors and General Motors pointed out the vehicle involved in the accident. **Plaintiff's Exhibit #2**. Lesho testified that he received the serial number right after the accident from Mark Bowen and also obtained the serial number when he returned to work for a brief time following the accident. (**Plaintiff's Exhibit #23**, Lesho deposition, pg. 87). Additionally, Lesho testified that he had another co-employee, Flikkie, verify the serial number after the accident. (**Plaintiff's Exhibit #23**, Lesho deposition, pg. 98). Defendant has no argument on the product identity issue and in fact, did not properly raise the argument in its brief.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests this Court deny Defendant's motion in its entirety and assess costs against the Defendant.

Respectfully submitted,

KAECHELE & WILENSKY, P.C.

S/Neal J. Wilensky
Neal J. Wilensky (P35182)
10775 S. Saginaw, Suite C
Grand Blanc, Michigan 48439
(810) 606-0410
cindycy02@hotmail.com

-20-

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

I hereby certify that on May 4, 2005, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Attorney Lisa A. Robinson.

Respectfully submitted,

KAECHELE & WILENSKY, P.C.


S/Neal J. Wilensky
Neal J. Wilensky (P35182)
10775 S. Saginaw, Suite C
Grand Blanc, Michigan 48439
(810) 606-0410
cindycy02@hotmail.com

-1-

## INDEX OF EXHIBITS

1.    Photograph of Cart

2.    Photograph of the aerial number on the cart

3.    G.M. Safety Incident Report

4.    Deposition of Mark Bowen, February 15, 2005; (pgs. 2, 13, 14, 17, 28, 56, 57, 63)

5.    Diagram prepared by Bowen

6.    Great Lakes Power Lift work order

7.    Dobbyn inspection

8.    Deposition of Terry Dobbyn, February 15, 2005; (pgs. 13, 14, 15, 25, 28)

9.    Deposition of Michael Fagan, March 2, 2005; (pgs. 4, 16, 17, 28, 32, 33, 38, 39, 48, 49)

10.    General Motors purchase order

11.    Chief Cart document documenting purchase by GM

12.    Deposition of James Fisher, March 22, 2005; (pgs. 7, 8, 10, 20, 21, 23, 23, 26, 30, 36, 38, 39, 40, 41, 43, 49)

13.    Defendant's Answer to Plaintiff's Supplemental Interrogatory #2 dated March 10, 2005

14.    Owners Manual, Bates #: 00017

15.    Defendant's Answer to Plaintiff's Interrogatory #8

16.    OSHA Standard 1910.178

17.    OSHA Section 1910.6 of Title 29, Volume 5

18.    E-mail from Riad Mohamed of ANSI

19.    ANSI Standard

20.    Deposition of Professor Koenig, April 6, 2005; (pgs. 134, 186)

-1-

21.    Chief Cart invoice - toggle switch

22.    Professor Koenig's expert report

23.    Deposition of Daniel Lesho, February 11, 2005; (pgs. 87, 98)